UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

THE GAP, INC.; GAP (APPAREL) LLC,
                   :

            Plaintiffs,    :

   -against-            :

G.A.P. ADVENTURES INC.,     :

            Defendant.    :

-------------------------------------------------------------- x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED: 6/29/11**

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**
**FOLLOWING A BENCH TRIAL**

07 Civ. 9614 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

On May 24, 25, and 31 and June 1 and 2, 2011, the parties appeared before me for

a bench trial in this trademark infringement and dilution case. I listened to the testimony,

carefully considered the evidence, and delivered my findings of fact and conclusions of law at

the conclusion of trial. These written findings of fact and conclusions of law replace those I

delivered orally.

## FINDINGS OF FACT

### About Gap

    **1.**    Plaintiff The Gap, Inc. is a Delaware corporation with its principal place

of business at 2 Folsom Street, San Francisco, California, 94105. Plaintiff Gap (Apparel) LLC is

a limited liability company that has a business address at 2 Folsom Street, San Francisco,

California 94105. Gap (Apparel) LLC is a wholly owned subsidiary of The Gap, Inc. I will refer

to them collectively as "Gap."

    **2.**    Donald and Doris Fisher opened the first Gap retail store on Ocean

Avenue in San Francisco, California, in 1969. At first, they sold Levis jeans, records, and tapes.

The name "The Gap" referred to the phrase "generation gap."

**3.**     From those humble beginnings, Gap has grown into one of the most famous and recognizable brands in the United States.

    **a.**   By 1990, around the time defendant G.A.P Adventures was founded, Gap's annual sales were $1.93 billion dollars. By that time, Gap had opened and was operating approximately 1,100 stores in the United States. Gap had also opened two stores in Canada, one in Vancouver, British Columbia, and one in Toronto, Ontario, in the Eaton Centre.

    **b.**   Gap's sales have tripled in the last twenty years. During its 2010 fiscal year, Gap's sales totaled $5.735 billion, with direct sales via the www.gap.com website representing $365 million of that amount.

**4.**     Today, Gap sells only Gap-designed and Gap-branded merchandise, including a wide variety of casual and "wear-to-work" clothing, shoes, accessories, jewelry, bags (including backpacks and bike bags), personal-care products, toys, paper products, bed and bath linens, and other merchandise using its trademarks. Other Gap brands include GapKids, babyGap, Gap Body, and Gap Outlet.

**5.**     Gap has spent tens of millions of dollars on advertising in the United States each year since the early 1990s and has been advertising in print media, on television, and on the radio for the last twenty to thirty years. Gap also receives unsolicited coverage and product placement on television shows and in motion pictures.

**6.**     The logo used in connection with the first Gap store was "the gap," printed in all lower-case letters, with a pattern of circles. Gap still uses that logo from time to time. Gap's current logo consists of white block capital letters against a navy blue background.

2

**7.**     Gap received its first federal trademark registration in 1972, for the mark "The Gap" for "retail clothing store services." That trademark has been in continuous use for retail stores since 1969 and the registration remains active today.

**8.**     In 1980, Gap received a federal trademark registration for the mark "Gap" for clothing, namely "pants, jeans, skirts, vests, jackets, overalls, jumpers, dresses, sweaters, T-shirts, belts, hats, visors, shorts, ponchos and halter tops." The registration remains active today.

**9.**     Today, Gap has over 100 trademarks registered on the Principal Register maintained by the United States Patent and Trademark Office.

### About G.A.P Adventures

**10.**     Defendant G.A.P Adventures Inc. is a corporation organized and existing under the laws of Ontario, Canada, and is engaged in the field of travel booking and travel agency services.

**11.**     Anita Voth and Bruce Poon Tip co-founded G.A.P Adventures in 1990. Voth and Poon Tip had met while working at the Toronto office of Worldwide Adventures, an Australian luxury travel tour operator. Poon Tip's sister, Jennifer Poon, a jewelry designer, designed the original logo for "G.A.P Adventures," an adventure travel company.

**12.**     The logo used block capital letters, "G," "A," and "P," with periods between the "G" and the "A" and between the "A" and the "P." The logo was intended as an acronym for the phrase "great adventure people." That phrase was made part of the logo, underneath "G.A.P Adventures."

**13.**     Voth left G.A.P Adventures in 1998. Voth's testimony and Poon Tip's testimony differ as to the circumstances that surrounded Voth's leaving the business, Voth claiming that she was promised money that she did not receive, and Poon Tip claiming that she

3

was paid all that he had promised her. The dispute will be addressed later, when I discuss the credibility of Voth and Poon Tip's testimony regarding instances of actual and likely confusion.

**14.** G.A.P Adventures made its first United States sales in 1993 when four tours were booked.

**15.** G.A.P Adventures has advertised continuously in the United States in various ways, including advertising through:

    **a.** brochures distributed to travel agents for distribution to consumers;

    **b.** magazine advertisements, in magazines such as Backpacker, Outside, and National Geographic Adventure;

    **c.** the Internet, since the advent of Google and Facebook;

    **d.** through Poon Tip's more than 1,000 speaking engagements in the United States in the last 20 years, where he discussed G.A.P Adventures, its services, and sustainable tourism generally;

    **e.** through features on nationally televised programs.

**16.** G.A.P Adventures' worldwide advertising and promotion costs, including brochure printing and distribution costs, increased steadily over time, from $5,987 in Canadian dollars in 1992, to $2,364,528 in Canadian dollars in the fiscal year ending July 31, 2006.

**17.** G.A.P Adventures' worldwide revenues have also increased steadily over time, from $140,866 in Canadian dollars in 1992 to $87,298,056 in Canadian dollars in 2007, when this lawsuit was filed.

    **a.** From four trips sold by G.A.P Adventures to United States customers in 1993, the number has increased each year. In 2007, the year this lawsuit was

4

filed, G.A.P Adventures sold 9,923 trips to United States customers and earned

United States revenues of $12,903,451.79.

**b.** G.A.P Adventures consistently wins awards for its travel services.

National Geographic has rated G.A.P Adventures the World's Best Adventure

Travel tour company.

### Fame of Plaintiffs' Marks by Early 1990s

**18.** By 1990, Gap operated approximately 1,100 stores in the United States,

United Kingdom, and Canada, with annual sales of $1.93 billion worldwide.

**19.** By that date, Gap's extensive advertising in print media and on television

and radio over a twenty-year period had made it a well-known and highly regarded trademark.

**20.** Gap and its trademarks were the subject of newspaper articles, magazine

stories, and television and motion picture features.  Gap was featured on the covers of Business

Week, Vogue, and Fortune.

**21.** Gap continued to spend tens of millions of dollars on advertising in the

United States annually in the years following 1990.

### Evidence of Intent by Defendant to Create an Association, and Actual Consumer Confusion

**22.** Throughout its history, G.A.P Adventures has been aware that its

customers and potential customers associate its name, and are likely to associate its name, with

Gap's trademarks, and are likely to be confused by such association.  The evidence includes:

> **a.** Voth was aware of plaintiffs' trademark "Gap" when she and Poon Tip
>
> chose the name "G.A.P Adventures" in 1990.  Although Poon Tip denied that he
>
> had had such knowledge, he admitted that he had been shown the corporate name
>
> "Gap, Inc." in a business name search.  Based on this documentary evidence, the

5

instances of actual confusion evident in G.A.P Adventures' corporate records, and the fact that plaintiffs' trademark "Gap" already was famous, I find Poon Tip's denial not credible.

    **b.** Voth testified that, when she and Poon Tip chose the name G.A.P Adventures, Poon Tip acknowledged that people would make an association between the "famous" Gap brand and G.A.P Adventures. Poon Tip commented that such an association "wouldn't hurt" G.A.P. Adventures. Although Poon Tip denied having made these comments, I find his denial not credible.

    **c.** The choice and retention by G.A.P Adventures of the Canadian domain name "www.gap.ca" since 1995.

**23.** G.A.P Adventures' new logo design, introduced in November 2008, placed even more prominence on the word "gap" and indicated an intention to increase the association with plaintiffs' name and trademarks. The new logo used bold font and lower-case letters for the word "gap" and no longer used periods between the "G" and the "A" and between the "A" and the "P." The word "adventures," although printed in all capital letters, was printed in much less bold font than the word "gap." The "great adventure people" tagline was left out altogether. These changes, and other ways in which defendant has identified itself, emphasize that its name is "Gap Adventures," rather than "G – A – P Adventures."

    **a.** G.A.P Adventures made these changes after this lawsuit had been filed, disregarding Gap's objections to G.A.P Adventures' use of the word "gap."

    **b.** G.A.P Adventures modified the new logo only after Gap objected. The new logo now includes the "great adventure people" tagline. However, the word

"gap" is still the most prominent aspect of the new logo and the tagline, printed in small letters and light gray font, is least prominent. There are still no periods.

    **c.** G.A.P Adventures made other changes toward the same purpose of emphasizing its name as "Gap Adventures," rather than "G – A – P Adventures."

        **i.** G.A.P Adventures has called its newsletter, published on its website, "The World According to G.A.P." G.A.P Adventures' offices in South and Central America are called "G.A.P Shacks" and employees are called "Gappers."

        **ii.** G.A.P Adventures often drops the tagline, "great adventure people," on promotional items, brochures, catalogs, and newsletters, frequently referring to itself as "Gap Adventures."

        **iii.** Although in June 2010, more than two-and-a-half years after this lawsuit was filed, G.A.P Adventures' sent an email to its employees, instructing them to use G.A.P Adventures' name in full whenever referring to the company, employees frequently disregarded that instruction and continued to refer to the company as "G.A.P." G.A.P Adventures did not repeat the memorandum and had no compliance program to discipline employees for referring to the company as "G.A.P."

    **d.** G.A.P Adventures stocks clothing in its store, for example, T-shirts printed with the name "G.A.P Adventures." In 1998 and 2004, G.A.P Adventures offered such clothing for sale. Poon Tip testified that it was no longer G.A.P Adventures' policy to sell clothing, or even to use the word "gap" in any form on

7

clothing available to the general public. Again, I find his testimony not credible. Plaintiffs' investigator visited G.A.P Adventures' Toronto office on May 27, 2011, saw T-shirts in various colors in the reception area with G.A.P Adventures' new logo printed on the top back of the shirt, was given a T-shirt, and brought it to the trial, where it was introduced into evidence.

**24.** Defendant's name, G.A.P Adventures, has given rise to evidence of actual consumer confusion.

  **a.** Voth testified that between 1991 and 1998, customers called G.A.P Adventures' Toronto office looking for Gap clothing.

  **b.** Although G.A.P. Adventures contended in discovery, and Poon Tip testified, that they knew of no instances of actual confusion, the evidence of record proves to the contrary. After discovery closed, G.A.P Adventures produced records for 11 months in 2001 and 7 months in 2002, showing that 11 potential customers requesting G.A.P Adventures' brochures had advised that they had been "looking for the Gap clothes store." Poon Tip conceded that he had represented that he had not known of any instances of actual confusion only on the basis of memory, and without having ordered a search of his company's computer records. G.A.P Adventures' answers to interrogatories, claiming that the company knew of no instances of actual confusion, was not supplemented, even after the company and its counsel knew that there actually had been such instances, in violation of Fed. R. Civ. P. 26(e)(1)(A). The fair inference, which I draw, is that throughout the history of G.A.P Adventures, a certain number of

8

visitors to its website and readers of its brochures responded to G.A.P.

Adventures in the belief that there was a connection to plaintiffs.

    **c.**    There is much else that causes me to find that Poon Tip's denial of

knowledge is not credible and that there were instances of actual confusion.

    **d.**    In 2006, when Poon Tip was proposing to change the name of the

Planeterra Foundation to the G.A.P Adventures Foundation, Elinor Schwob,

Planeterra Foundation's Fundraising Coordinator, stated in an email to Poon Tip

that she had located G.A.P Adventures thinking it had a connection to the Old

Navy/Gap Foundation. She wrote in her email to Poon Tip that she had "found

GAP adventures originally" when she had "googled GAP Foundation looking for

the Old Navy / GAP Foundation (sorry but its true)." PX 188.

    **e.**    John Joseph Serafini, G.A.P Adventures' Director of Marketing from July

2008 through late 2009, was approached by a friend and asked whether there was

any connection between Gap and G.A.P Adventures.

    **f.**    Jeffrey Russill, G.A.P Adventures' Director of Operations and Product

Development, was asked on two to four occasions whether there is a relationship

between Gap and G.A.P Adventures.

**Course of Dealings Between Gap and G.A.P Adventures and the Filing of This Lawsuit**

    **25.**    Plaintiffs by the late 1990s were aware of G.A.P Adventures as a

Canadian wholesaler of travel tours. Plaintiffs also were aware of defendant's Canadian domain

name, "www.gap.ca." Poon Tip testified that, in 1998, a lawyer whom he could not identify and

whom he assumed represented plaintiffs called to ask about purchasing the "www.gap.ca"

domain name. Plaintiffs denied that it had made any such approach, and the evidence is too

indefinite to permit me to make a finding (other than the general unreliability of Poon Tip's testimony on material points).

  **26.** In 2005, Gap sought to purchase the "www.gap.ca" domain name. Gap also expressed its concerns about G.A.P Adventures' expanding use of its marks in Canada, which included G.A.P Adventures' use of its name on street-level concept stores in Vancouver, British Columbia, and Toronto, Ontario, which had opened in 2003 and 2005. Negotiations ensued but were unsuccessful.

  **27.** Plaintiffs did not know then, but G.A.P Adventures was planning to expand its business in the United States and to open a concept store in New York City.

  **28.** G.A.P Adventures had filed its first federal trademark application in the United States in 2004, for the mark "G.A.P Adventures" for travel services. Plaintiffs learned of the application in 2006, when it was duly published, and filed an opposition to the registration.

  **29.** G.A.P Adventures opened a street-level concept store in New York City at 364 Avenue of the Americas on August 14, 2007.

    **a.** The G.A.P Adventures trademark and trade name appear on external and internal signage on its store. The original overhead sign used the old logo, i.e., "G.A.P Adventures," in all capital letters, with periods, and with the tagline "the great adventure people" written in smaller, lower-case letters underneath.

  **30.** The opening of the New York City concept store represented a change in the way G.A.P Adventures was doing business in the United States.

    **a.** Before the New York City store opened in 2007, G.A.P Adventures had relied on its partnerships with travel agents to sell tours in the United States. It

10

had not operated any stores in the United States and had not advertised in any United States newspapers.

    **b.** G.A.P Adventures opened its concept store in New York City to increase brand awareness.

    **31.** Gap filed this lawsuit on October 29, 2007, less than three months after G.A.P Adventures had opened its New York City store.

### Summary of Important Testimony at Bench Trial

    **32.** At trial, I heard testimony from several fact and expert witnesses and considered the parties' documentary evidence. Key witnesses included:

    **a.** Anita Voth, co-founder of G.A.P Adventures. Voth's testimony was presented by playing excerpts from her videotaped deposition. I found her testimony to be credible.

    **b.** Bruce Poon Tip, CEO and co-founder of G.A.P Adventures. Poon Tip testified about the founding of G.A.P Adventures and its continued growth and success over the last twenty years. Although Poon Tip is knowledgeable about his business, his testimony on material points was not consistent and not credible.

    **c.** Dr. Gerald Ford, a partner in the marketing research and consulting firm of Ford Bubala & Associates, where he has been engaged in commercial marketing research and consulting for the past 35 years. Dr. Ford has designed and conducted over 750 surveys, both in connection with litigation and for other purposes. He testified for plaintiffs as an expert on marketing and marketing research and presented the results of his two surveys addressing likelihood of dilution.

11

    **i.**    The population for both surveys consisted of men and women 18 years of age or older who reported that they were likely, within the next year, to use the Internet to search for information on travel tours outside the continental United States.

        **1.**    This survey population was appropriate. Although G.A.P Adventures' expert, Dr. Yoram Wind, gave the opinion that respondents should have been asked, more specifically, whether they were likely to search for information on adventure- and eco-tourism travel tours, because that is G.A.P Adventures' target audience, Poon Tip testified as to the wide variety of travel tours that G.A.P Adventures now offers, to appeal to varying and extensive segments of the population. The survey population was therefore appropriate.

    **ii.**    Respondents for both of Ford's surveys were selected randomly and assigned to either a test cell or a control cell.

    **iii.**    Ford's first survey addresses the likelihood of dilution using G.A.P Adventures' old logo.

        **1.**    In the test cell, respondents were exposed to an abbreviated version of G.A.P Adventures' website that used the old logo on the home page and that linked to hundreds of other G.A.P Adventures web pages.

        **2.**    In the control cell, respondents were exposed to a website identical to that used in the test cell, except that "G.A.P" was

12

replaced with the words "Great Adventure People" wherever it appeared. The "great adventure people" tagline was eliminated from the website as redundant. Otherwise, the questions and procedures for the test cell and the control cell were identical.

3.   Respondents in both cells were asked, "What company or brand, if any, comes to mind when you see the name on this website?" If the respondent identified a company or brand, he or she was asked follow-up questions about that company or brand. Respondents were also asked what other companies or brands, if any, came to mind.

4.   When shown the test cell website, 60.95% of respondents reported that Gap, either alone or in conjunction with another company or brand, came to mind.

5.   When shown the control cell website, none of the respondents reported that Gap, alone or in conjunction with another company or brand, came to mind.

6.   This survey demonstrates that exposure to G.A.P Adventures' old logo caused an association with Gap's marks for 60.95% of adults in the relevant universe. This association was attributable to G.A.P Adventures' use of "G.A.P" in its logo—the absence of "G.A.P" was the only difference between the test cell and the control cell.

13

      7.   Several of the verbatim responses demonstrate further that consumers associate G.A.P Adventures' logo with plaintiffs.

iv.   Ford's <u>second survey</u> addresses the likelihood of dilution using G.A.P Adventures' new logo.

      1.   The survey population, methodology, design, and procedures were the same as in Ford's first survey.

      2.   In the test cell, respondents were exposed to an abbreviated version of G.A.P Adventures' website that used the new logo.

      3.   In the control cell, respondents were exposed to a website identical to that used in the test cell, except the word "gap" in the new logo was replaced with the word "tap" wherever it appeared and the "great adventure people" tagline was replaced with "travel adventure people" wherever it appeared. Otherwise, the questions and procedures for the test cell and the control cell were identical.

      4.   The questions from the first survey were used.

      5.   When shown the test cell website, 38.61% of respondents reported that Gap, either alone or in conjunction with another company or brand, came to mind.

      6.   When shown the control cell website, 0.99% of respondents reported that Gap, alone or in conjunction with another company or brand, came to mind.

14

> 7.    This survey demonstrates that 37.62% of respondents who
> associated G.A.P Adventures' new logo with Gap did so as a
> result of the presence of the word "gap" in the new logo.
>
> 8.    Several of the verbatim responses also demonstrate that
> consumers associate G.A.P Adventures' new logo with Gap.

v.    Dr. Wind gave the opinion that Dr. Ford's control cells should have included uses of the word "gap" to which Gap had not objected, to provide a proper baseline for comparison. However, I find that it was proper for Dr. Ford to exclude the word "gap" from his control cells.

vi.    Dr. Wind criticized Dr. Ford's survey question, asking if any companies or brands came to mind after viewing the G.A.P Adventures' website, as leading. Dr. Ford defended the appropriateness of the question in light of the purpose of the survey, i.e., to test for brand awareness. He commented further that he had asked the same questions in the control cell as in the test cell, and that the elimination of a reference to "G.A.P" in the control cell stimulus had led to a complete absence of brand association.

vii.    Another control cell, to ask survey respondents an open-ended question, such as, "What is the first thing that comes to mind when you see the name on this website," might have been desirable. See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 109 (2d Cir. 2009) (describing survey done by Starbucks to support dilution claim). However, two different control cells could cause skewing in other

15

respects and, by complicating and extending the questioning, affect the
willingness of respondents to be questioned.

**viii.** I accept the appropriateness and relevance of Dr. Ford's surveys. I
find that they show a likelihood of association between G.A.P.
Adventures and variants, with plaintiffs' trademark "Gap."

**d.** Hal Poret, a Vice President at ORC Guideline, where he has been engaged
in designing, supervising, and analyzing consumer surveys since 2004. Poret has
conducted over 350 consumer surveys, over 100 of which related to trademarks.
He testified for plaintiffs as an expert on consumer surveys and presented the
results of his survey that addressed the likelihood of consumer confusion.

**i.** The population for Poret's survey consisted of men and women 18
years of age or older who lived in, worked in, shopped in or otherwise
visited the area in which G.A.P Adventures' New York City store is
located and who were likely to shop for travel tour packages or travel
tours in the next 12 months. This universe was designed to include both
actual and prospective purchasers of G.A.P Adventures' services.

**1.** This survey population was appropriate. Dr. Wind gave the
opinion that respondents should have been asked, more
specifically, whether they were likely to shop for adventure- and
eco-tourism travel tours, because that is G.A.P Adventures'
target audience. Dr. Wind's criticism is rejected for reasons
already stated.

16

**ii.**    The survey excluded from the population individuals who might have a unique insight or knowledge about the subject matter, i.e., those working in advertising or market research, for a company that sells travel tours, or for an airline. It was appropriate to screen out such individuals because this survey was meant to test the perception of ordinary consumers and not that of individuals with unique or special knowledge.

**iii.**    Interviewers approached consumers at three public on-street locations in Manhattan in the area of G.A.P Adventures' store.

**1.**    Dr. Wind gave the opinion that the street-intercept method and the locations chosen were not appropriate, because there were two Gap stores in the vicinity and there was no way to control the effect of outside stimuli, e.g., passersby carrying Gap shopping bags or wearing Gap clothing. However, I find that the street-intercept method and the locations chosen were appropriate, because they simulated the market conditions under which a consumer would see the G.A.P Adventures storefront.

**iv.**    Poret did not conduct a control cell at the same time as the test cell because he was not retained to conduct a control cell initially. Gap had retained Poret to do a survey before Gap filed this lawsuit. Gap wanted to assess whether it should be concerned about G.A.P Adventures' New York City concept store. Poret eventually did conduct a control cell, approximately one year after he had conducted the test cell.

17

**1.** Dr. Wind gave the opinion that, because Poret conducted the control cell approximately one year after he had conducted the test cell, the assignment of respondents to either the test cell or the control cell was not randomized. Dr. Wind explained that, when you administer the test cell and the control cell at different times, it is impossible to account for the effects of changes in context and environment in the interim. The record does not show any change in context or environment, other than the continuing efforts by defendant to make use of, and emphasize, "gap" as part of its name and to identify its services. I find, contrary to Dr. Wind's criticism, that the survey was properly controlled and properly randomized.

**v.**    Respondents in the test cell were shown the test stimulus: a photograph of the front of G.A.P Adventures' New York City store.

**vi.**    Respondents in the control cell were shown a photograph identical to that used in the test cell, except the storefront sign that read "G.A.P Adventures" was replaced with a storefront sign that read "The Great Adventure People Adventures." Otherwise, the stimuli used in the test cell and the control cell were the same.

**1.** Dr. Wind gave the opinion that the photograph used in the survey was not very clear and the nature of G.A.P Adventures' business was not evident from the photograph. However, Poret's survey tests initial consumer confusion upon first

18

encountering the G.A.P Adventures store. The photograph used was taken from G.A.P Adventures' own website. Although the overhead sign has since been removed from the G.A.P Adventures' storefront, there is no evidence that the photograph does not accurately depict G.A.P Adventures' storefront when the overhead sign was in place.

**vii.** Survey respondents reviewed the photograph and then were asked three sets of questions:

    **1.** In Question Set 1, respondents were asked what services or products they would expect to be able to get at the store in the photograph. The purpose of this question was to determine whether respondents believed the store to be a Gap store.

    **2.** In Question Set 2, respondents were asked whether they thought the company that operates the store in the photograph also operates any other store or business (Question 2a). Respondents answering "yes" were then asked: (2b) what other store or business; (2c) what made them think so; and (2d and 2e) what services or products the other store or business provides. The purpose of these questions was to determine whether respondents believed the store in the photograph to be operated by the company that runs Gap stores.

    **3.** In Question Set 3, respondents were asked, "Do you think the company that operates the store I showed you got

19

authorization, that is, permission, from any other company to use their name, or not, or don't you know." (Question 3a). Respondents answering "yes" were then asked: (3b) from what other company was permission obtained; (3c) what services or products that company provides; and (3d) why they thought permission was obtained. The purpose of these questions was to determine whether respondents believed that the company that operates the store in the photograph obtained authorization or permission to use its name from Gap clothing.

viii.   Overall, the survey demonstrates that 40.9% of respondents in the test cell were confused into thinking either that (1) the G.A.P Adventures store was a Gap store, or (2) the G.A.P Adventures store was operated by the same company as Gap, or (3) the G.A.P Adventures store was authorized by Gap.

ix.   None of the respondents in the control cell, who saw the "Great Adventure People Adventures" sign, thought the store was a Gap store, was operated by the same company as Gap, or was authorized by Gap.

x.   By comparing the results in the test cell and the control cell, Poret concluded that (1) there is a significant likelihood that consumers will confuse G.A.P Adventures with Gap; and (2) this likelihood of confusion is due solely to G.A.P Adventures' use of the word "G.A.P"—when the word "G.A.P" was removed, no respondents were confused.

xi.   I credit Poret's survey as evidence of a likelihood of confusion.

20

e.  Dr. Yoram Wind, Director of the SEI Center for Advanced Studies in
Management at the Wharton School, who does consulting work with corporations
seeking to improve their marketing efforts and in connection with intellectual
property litigation.  Dr. Wind has been accepted by courts as an expert in
marketing research and consumer surveys for over thirty years.  Dr. Wind offered
his expert opinion as to whether there is a likelihood of confusion or dilution.

i.  Dr. Wind first completed a marketing analysis of Gap and G.A.P
Adventures.

1.  Dr. Wind evaluated a large volume of Gap and G.A.P
Adventures' publicly available marketing materials,
advertisements, websites, goods and services, etc. and visited
Gap and G.A.P Adventures' stores to assess similarities and
differences between the brands.

2.  Dr. Wind concluded that there are dramatic differences
between Gap and G.A.P Adventures, in terms of their logos; the
markets they serve; the setup of their stores (large v. tiny,
narrow, and long); the goods and services they offer (casual
wear and accessories v. travel); the price range of their offerings
(relatively cheap v. expensive); their means of distribution (retail
stores v. travel agents, website, and by telephone); their number
of stores (over 1000 v. one); their advertising (large volume in a
variety of media v. primarily travel-related media); their
websites (fun and easy v. detail-oriented and factual); their value

21

propositions (American casual lifestyle v. discovery, adventure, and eco-tourism); and overall messages (celebrity, lifestyle, and fun v. excitement, discovery, eco-tourism, and sustainability).

3. Dr. Wind concluded, based on his marketing analysis, that the consuming public would perceive Gap and G.A.P Adventures as totally different brands, without any overlap.

4. In Dr. Wind's opinion, given the differences between the brands, consumer confusion and dilution are unlikely.

5. I do not give significant weight to Dr. Wind's marketing analysis. His analysis does not address the perception of ordinary consumers upon initially encountering G.A.P Adventures in the marketplace, as reflected by the evidence of actual confusion actually encountered by defendant throughout its history, and as measured by the survey evidence. The confusion arises from an association between plaintiffs and defendant that causes an attraction, because of the application of plaintiffs' famous marks to defendant's service offerings.

ii. Dr. Wind conducted a survey in rebuttal to Dr. Ford's survey, asking whether, in reference to some descriptive uses of the word "gap," an association with plaintiffs' marks came to mind.

1. Dr. Wind asked for brand associations in relation to the phrases, "Watch the Gap," "Bridge the Gap," and "Ultimate Gap." Dr Wind tested six such stimuli in eight shopping malls.

22

**2.**    Approximately 54% of respondents mentioned Gap when asked what company or brand, if any, came to mind when they saw Dr. Wind's stimuli.

**3.**    Dr. Wind concluded that approximately the same percentage of respondents had associated G.A.P Adventures' logos with Gap's marks as had associated benign uses of the word "gap" with Gap's marks.

**4.**    Dr. Wind testified that his survey shows that consumers think of Gap whenever the word "gap" is used, whether used descriptively or in another trademark usage.

**5.**    I find that Dr. Wind's study confirms the fame and strength of Gap's marks. It does not speak to the issues with which I am concerned, i.e., whether defendant's use of a similar name has caused a likelihood of confusion, or of dilution, with respect to plaintiffs' trademarks.

### SUMMARY OF THE PLEADINGS

**33.**    Gap's complaint alleges eight claims for relief:

**a.**    Count I: federal trademark infringement, in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

**b.**    Count II: federal trademark infringement, false designation of origin, and unfair competition, in violation of § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

23

    **c.**  Count III: federal unfair competition comprising false and misleading statements of fact, in violation of § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B);

    **d.**  Count IV: federal trademark dilution, in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c);

    **e.**  Count V: trademark dilution, in violation of N.Y. Gen. Bus. Law §§ 360 et seq.;

    **f.**  Count VI: violation of New York Deceptive Trade Practices Statute, N.Y. Gen. Bus. Law § 349 (withdrawn by stipulation);

    **g.**  Count VII: violation of the New York False Advertising Statute, N.Y. Gen. Bus. Law §§ 350, 350-e (withdrawn by stipulation);

    **h.**  Count VIII: common law trademark infringement, unfair competition, and misappropriation.

**34.**    G.A.P Adventures filed its answer on December 11, 2007.

    **a.**  In its, answer, G.A.P Adventures raised a number of affirmative defenses to Gap's claims. However, at trial, the only affirmative defense that G.A.P Adventures pressed was laches.

    **b.**  G.A.P Adventures also pleaded a counterclaim that, read liberally, seeks a declaration of non-infringement (because "[t]here is no likelihood of confusion"); non-dilution (because "[t]he mark sought to be registered by G.A.P Adventures does not dilute nor is it likely to dilute [Gap]'s marks"); and the right to register "'G.A.P Adventures' for travel-related services."

24

## CONCLUSIONS OF LAW

**35.**     I have subject matter jurisdiction to decide Gap's claims pursuant to 15

U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a) and (b). I have supplemental jurisdiction to

decide Gap's state-law claims pursuant to 28 U.S.C. § 1367(a).

**36.**     I have personal jurisdiction over G.A.P Adventures. Venue in this district

is proper pursuant to 28 U.S.C. § 1391(b) and (c) and was not challenged by G.A.P Adventures.

### COUNT I: Federal Trademark Infringement
### § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

### COUNT II: Federal Trademark Infringement, False Designation of Origin,
### and Unfair Competition
### § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)

**37.**     I grant judgment in favor of Gap as to these claims.

**38.**     To prevail on its federal trademark infringement claims under the Lanham

Act, Gap must prove that (1) its trademarks merit protection, and (2) G.A.P Adventures has used

similar marks in commerce such that there is a likelihood of confusion as to source or deception

as to affiliation, connection, or sponsorship of G.A.P Adventures' services. Virgin Enters, v.

Nawab, 335 F.3d 141, 146 (2d Cir. 2002). This same two-step test applies whether the

infringement claim is brought under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), or under

§ 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 11125(a)(1)(A). Virgin Enters., 335 F.3d at 146.

**39.**     "[D]irect competition between the parties is not a prerequisite to a

trademark infringement claim." Lexington Mgmt. Corp. v. Lexington Capital Partners, 10 F.

Supp. 2d 271, 278 (S.D.N.Y. 1998).

**40.**     Gap's marks are entitled to protection. Because Gap's marks for "retail

clothing stores services" and for "clothing" have been registered for much more than five

consecutive years, those marks are "inconstestable" and conclusively presumed valid. 15 U.S.C.

25

§§ 1065, 1115(a); Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 393 n.6 (2d Cir. 1995). In addition, "Gap," used as a trademark, is arbitrary when used to describe the goods that Gap offers, namely, clothing, accessories, and personal care products. An arbitrary mark "may always claim trademark protection, is never a common name for a product, and bears little or no relationship to the kind of product represented." Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993). Because the "Gap" mark is arbitrary, it is inherently distinctive and entitled to protection. 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:4 (4th ed. 2011) ("[A]rbitrary marks are protectable and registrable immediately upon use . . . .").

**41.** In assessing whether G.A.P Adventures has used a similar mark in commerce that is likely to cause consumer confusion as to source or to deceive as to affiliation, connection, or sponsorship of its services, I am guided by the non-exclusive factors set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961). These factors are: **(1)** the strength of Gap's marks; **(2)** the similarity of G.A.P Adventures' marks to Gap's marks; **(3)** the proximity of the services sold under G.A.P Adventures' marks to the goods sold under Gap's marks; **(4)** the likelihood that Gap will "bridge the gap"; **(5)** actual consumer confusion; **(6)** G.A.P Adventures' good or bad faith; (7) the quality of G.A.P Adventures' services; and **(8)** the sophistication of consumers. Virgin Enters., 335 F.3d at 146–47.

> a. Strength of Gap's marks. This factor weighs strongly in favor of finding a likelihood of confusion. "Gap" as a trademark is inherently distinctive because it is arbitrary when used to describe the goods that Gap offers. Gap's marks are also strong in terms of acquired distinctiveness. Gap's marks are famous and have become some of the most recognizable marks in the United

26

States over the last forty years. Gap has stores all over the United States; spends tens of millions of dollars on advertising each year in a variety of media; and receives unsolicited coverage and product placement on television shows and in motion pictures. Gap enjoyed sales of well over five billion dollars during its 2010 fiscal year. Because Gap's "mark[s] ha[ve] been long, prominently, and notoriously used in commerce," id. at 148, there is an increased likelihood that a consumer who encounters G.A.P Adventures' website or concept store will assume incorrectly that it is affiliated with or sponsored by Gap. Id. at 148–49. A mark's strength derives from "'its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source.'" Sports Auth. v. Prime Hospitality Corp., 89 F.3d 955, 960–61 (2d Cir. 1996). There is no question that Gap's marks meet this standard.

> i.   G.A.P Adventures has submitted evidence of the registration of
> third-party trademarks that use the word "gap," in an attempt to show
> that Gap's marks are weak. However, "[t]he significance of third-party
> trademarks depends wholly upon their usage." Scarves by Vera, Inc. v.
> Todo Imports, Ltd., 544 F.2d 1167, 1174 (2d Cir. 1976). G.A.P
> Adventures has failed to introduce evidence that the third-party
> trademarks are actually used by third parties, or are well promoted, or are
> recognized by consumers. Id. I find that Gap's strong marks have not
> been weakened by third-party uses.

b.   Similarity of G.A.P Adventures' marks to Gap's marks. This factor weighs strongly in favor of finding a likelihood of confusion. "In assessing

27

similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Gruner + Jahr, 991 F.2d at 1078. Gap and G.A.P Adventures' marks both appear on storefronts and on web pages and the names are pronounced the same way. In both G.A.P Adventures' old and new logos, the word "gap" is featured more prominently than other components. G.A.P Adventures' old logo consists of white block capital letters against a bluish, purplish background and is similar to Gap's current logo, which consists of white block capital letters against a navy background. G.A.P Adventures' new logo uses all lower-case letters, much like Gap's original logo. The tagline "great adventure people" is the least prominent component of both G.A.P Adventures' old and new logos and G.A.P Adventures has consistently, over time, omitted the "great adventure people" tagline altogether. Combined with the lack of periods in the new logo, the identity of "G.A.P" as an acronym has been greatly diminished. G.A.P Adventures has also used the word "G.A.P" without the word "adventures," making its marks even more similar to Gap's.

c.    Proximity of goods and services.    This favor weighs in favor of finding a likelihood of confusion, although only slightly. The inquiry here "concerns whether and to what extent the two products compete with each other," looking to "'the nature of the products themselves and the structure of the relevant market.'" Cadbury Beverages v. Cott Corp., 73 F.2d 474, 480 (2d Cir. 1996) (quoting Vitarroz v. Borden, Inc., 644 F.2d 960, 967 (2d Cir. 1981)). In assessing "the structure of the market," I consider "the class of customers to whom the goods

[and services] are sold, the manner in which the products are advertised, and the channels through which the goods [and services] are sold." Id. Gap's clothes are obviously not in direct competition with G.A.P Adventures' travel tours and services. However, Gap and G.A.P Adventures' sell their goods and services to an overlapping class of customers, as evidenced by G.A.P Adventures' 2007–2008 marketing plan, which describes G.A.P Adventures' "core user" as someone who shops at Gap. In addition, Gap and G.A.P Adventures both offer their products for sale on their websites and through retail stores. This minimal degree of proximity increases the likelihood of consumer confusion, but only slightly.

   **d.**   Likelihood that Gap will "bridge the gap." This factor either is neutral, or weighs slightly against finding a likelihood of confusion. Although there is no evidence that Gap plans to enter the travel tour business, "nor has it provided any evidence that the public believes it will do so," Sports Auth., 89 F.3d at 963, there is a likelihood that consumers will bridge an "associational gap." Defendant's use of "gap" in its name, however spelled, is likely to cause consumers to believe, if only initially, that there is likely a relationship or sponsorship between plaintiffs and defendant, and defendant has found this association useful in attracting potential consumers to its website and its concept stores.

   **e.**   Actual consumer confusion. This factor weighs strongly in favor of finding a likelihood of confusion. The evidence does not, and need not, show that consumers purchased G.A.P Adventures' travel tours thinking they were buying them from Gap. Rather, the evidence suggests a likelihood that, due to use of the word "gap," G.A.P Adventures gains "credibility during the initial phases" of its

29

interaction with a potential customer. Mobil Oil Corp. v. Pegasus Petroleum
Corp., 818 F.2d 254, 259 (2d Cir. 1987). "[I]nitial confusion works a sufficient
trademark injury." Id. at 260. As discussed above, G.A.P Adventures' employees
were asked about a relationship with Gap, customers called G.A.P Adventures
looking for Gap, customers requested brochures after coming across G.A.P
Adventures while looking for Gap, and customers found G.A.P Adventures'
website while looking for GAP. Poret's survey is also probative of a likelihood of
confusion.

**f.**     G.A.P Adventures' bad faith.     This factor also weighs in favor of finding a
likelihood of confusion. This factor "look[s] to whether the defendant adopted its
mark with the intention of capitalizing on plaintiff's reputation and goodwill and
any confusion between his and the senior user's product." Sports Auth., 89 F.3d
at 964. I find that when Poon Tip chose the name "G.A.P Adventures," he
accepted the idea that the name he chose would likely capitalize on an association
with Gap. The record contains considerable evidence showing that Poon Tip
acted to strengthen that association over time.

**g.**     Quality of G.A.P Adventures' services.     This factor is neutral in the
likelihood of confusion analysis. Courts consider the quality of the junior user's
goods or services to assess "whether the senior user's reputation could be
jeopardized by virtue of the fact that the junior user's product is of inferior
quality." Arrow Fastener, 59 F.3d at 398. G.A.P Adventures' growth and success
suggest that it provides services of satisfactory quality. That fact does not have a
significant effect on whether consumer confusion is likely.

30

**h.** Sophistication of consumers. This factor is neutral. "Because likelihood of confusion 'must be assessed by examining the level of sophistication of the relevant purchasers' of the plaintiff's [goods] and defendant's services, '[I] must consider the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" Sports Auth., 89 F.3d at 965 (quoting W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993)). G.A.P Adventures' travel tours are expensive. A consumer is likely to pay attention before making such an expenditure and is therefore not likely to mistakenly believe the tour comes from Gap. However, there is a likelihood that a potential purchaser of a travel tour "would be misled into an initial interest in" G.A.P Adventures, due to the perception of a connection or association with Gap. Mobil Oil Corp., 818 F.2d at 260. Once defendant has a potential customer in the door, it has a significant advantage in making a sale.

**42.**  Balancing the factors. I conclude that, given the strength of Gap's marks, the similarities between Gap's marks and G.A.P Adventures' logos, and the evidence of actual confusion and Poon Tip's bad faith, a likelihood of confusion exists. I therefore grant judgment in favor of Gap on counts I and II of its complaint.

## COUNT III: Federal Unfair Competition Comprising False/Misleading Statements of Fact § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

**43.**  The facts at trial did not extend beyond those relevant to a trademark infringement claim, and Gap has not advanced any argument as to this claim. I therefore deem Gap to have abandoned this claim. Count III is dismissed.

31

## COUNT IV: Federal Trademark Dilution
## § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)

**44.**     I grant judgment for G.A.P Adventures, dismissing this claim.

**45.**     Pursuant to 15 U.S.C. § 1125(c)(1),

> [s]ubject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring . . . of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

**46.**     "Dilution by blurring" is defined as an "association arising from the

similarity between a mark or trade name and a famous mark that impairs the distinctiveness of

the famous mark." 15 U.S.C. § 1125(c)(2)(B).

**47.**     In order to prevail on its federal trademark dilution claim, Gap must prove

that **(1)** its marks are famous; **(2)** G.A.P Adventures is making use of its marks in commerce; **(3)**

G.A.P Adventures' use of its marks began after Gap's marks became famous; and **(4)** G.A.P

Adventures' use of its marks is likely to cause dilution by blurring by creating a likelihood of

association with Gap's marks, as a result of similarity between the marks, and a likelihood of

impairment of the distinctiveness of Gap's marks. See NYC Triathlon, LLC v. NYC Triathlon

Club, Inc., 704 F. Supp. 2d 305, 321 (S.D.N.Y. 2010); 4 J. THOMAS MCCARTHY, MCCARTHY ON

TRADEMARKS AND UNFAIR COMPETITION § 24:99 (4th ed. 2011). Of the relevant considerations,

I rule that plaintiffs have not proved that defendant's use of the word "gap" as part of its name

and in relation to the travel services it offers has "impair[ed] the distinctiveness" of plaintiffs'

marks, nor is defendant likely to do so, particularly in light of the injunction that will be issued.

32

**48.** Many of my findings in support of Gap's federal trademark infringement claim carry over to my analysis of Gap's federal dilution claim. Gap's marks are famous and widely recognized by the general consuming public. Gap's marks had achieved their fame by the time G.A.P Adventures was founded. G.A.P Adventures uses its marks in commerce. G.A.P Adventures' marks and Gap's marks are similar; Gap's marks are strong in terms of both inherent and acquired distinctiveness; Gap's use of its marks is substantially exclusive in relation to the goods sold in its stores; Poon Tip intended to create an association with Gap (and he acted to strengthen that association over time); and Dr. Ford's surveys are probative of a likelihood of association between G.A.P Adventures' marks and Gap's marks.

**49.** However, I am not able to find that the association between the marks "impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B); see Starbucks Corp., 588 F.3d at 109. Gap's proofs establish that consumers are likely to associate G.A.P Adventures' marks with Gap's marks as a result of the similarities between the marks. However, "[t]he fact that people 'associate' the accused mark with the famous mark does not in itself prove the likelihood of dilution by blurring." 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:120 (4th ed. 2011). Gap has not proved that, as a result of the likelihood that consumers will associate the marks, Gap is likely to suffer an impairment of the distinctiveness of its marks. Gap has not proved any injury to its trademarks. Because Gap has not proved a likelihood of dilution by blurring, I grant judgment for G.A.P Adventures, dismissing Gap's federal dilution claim. I note also that an injunction to prevent further trademark infringement will make it highly unlikely that blurring might occur in the future.

## COUNT V: Trademark Dilution
### N.Y. Gen. Bus. Law §§ 360 et seq.

**50.** I grant judgment for G.A.P Adventures, dismissing this claim.

33

**51.**     Under New York law, "[l]ikelihood of . . . dilution of the distinctive

quality of a mark or trade name shall be a ground for injunctive relief[,] . . . notwithstanding the

absence of competition between the parties or the absence of confusion as to the source of goods

or services." N.Y. Gen. Bus. Law § 360-*l*.

**52.**     Because Gap has not shown a likelihood of dilution, or impairment, of the

distinctive quality of its marks, Gap has not proved its claim of dilution under New York law.

## COUNT VIII: Common Law Trademark Infringement, Unfair Competition, and Misappropriation

**53.**     I have already found for Gap on its federal trademark infringement claim.

Because I grant Gap all the relief it seeks in connection with that claim, it is unnecessary for me

to rule on Gap's common law trademark infringement and unfair competition claims. Count

VIII is dismissed.

## Affirmative Defense of Laches

**54.**     Laches is an equitable doctrine that bars a plaintiff's claim to equitable

relief "where he is 'guilty of unreasonable and inexcusable delay that has resulted in prejudice to

the defendant.'" Ivani Contracting Corp. v. City of N.Y., 103 F.3d 257, 259 (2d Cir. 1997)

(quoting Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 804 (8th Cir. 1979)).

**55.**     An affirmative defense of laches has three elements: (1) "plaintiff had

knowledge of defendant's use of its marks"; (2) "plaintiff inexcusably delayed in taking action";

and (3) "defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this

time." Cuban Cigar Brands N.V. v. Upmann Int'l, Inc., 457 F. Supp. 1090, 1096 (S.D.N.Y.

1978) (Weinfeld, J.).

**56.**     I conclude that laches does not apply because Gap acted in a commercially

reasonable manner in enforcing its rights. Gap monitored G.A.P Adventures' activities over

34

time. Gap opposed G.A.P Adventures' federal trademark application promptly after it was

published for opposition. Gap filed this lawsuit less than three months after G.A.P Adventures

opened its New York City concept store. There was little or no delay on Gap's part.

Furthermore, it is clear that defendant suffered no prejudice. Defendant knew of plaintiffs'

trademarks from the outset, and continued using the name it chose, "G.A.P. Adventures,"

notwithstanding, and ever more intensively and provocatively. Whenever plaintiffs complained,

defendant intensified its infringing conduct. Laches has not been proved.

### G.A.P Adventures' Counterclaim

57.    G.A.P Adventures' counterclaim is moot, since I granted judgment for

plaintiffs as to defendant's trademark infringements, and since I dismissed plaintiffs' claims for

trademark dilution. G.A.P Adventures' counterclaim is dismissed.

### Injunctive Relief Is Warranted

58.    The United States Supreme Court has made clear that,

> [a]ccording to well-established principles of equity, a
> plaintiff seeking a permanent injunction must satisfy a four-
> factor test before a court may grant such relief. A plaintiff
> must demonstrate: (1) that it has suffered an irreparable
> injury; (2) that remedies available at law, such as monetary
> damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is warranted;
> and (4) that the public interest would not be disserved by a
> permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

59.    Gap has suffered an irreparable injury because consumers are likely to be

confused initially or deceived as to a connection or affiliation between Gap and G.A.P

Adventures. Remedies at law will not compensate Gap for the boost in credibility that G.A.P

Adventures receives as a result of this initial confusion as to its affiliation.

35

**60.** The public interest would be served by an injunction because "the public has an interest in not being deceived." NYC Triathlon, 704 F. Supp. 2d at 344.

**61.** I therefore permanently enjoin G.A.P Adventures from using the word "gap," or any variation of the word "gap," whether used as an acronym, abbreviation, or otherwise.

**62.** I considered limiting the scope of the injunction, to permit G.A.P Adventures to refer to itself as "G – A – P Adventures," without actually using the word "gap." I conclude that permitting G.A.P Adventures such a use could easily give way to an infringing use, as shown by the history of this case.

**63.** G.A.P Adventures shall have until September 1, 2011, to transition to a new name in the United States. In the meantime, G.A.P Adventures shall instruct its employees not to use the word "gap" when referring to the company. Defendant's company may be referred to as having been "formerly known as G – A – P Adventures," but only in connection with a new, non-infringing name.

**64.** I further order G.A.P Adventures to remove all articles of clothing from publicly accessible areas of its stores.

**65.** The parties shall settle the form of a final decree enjoining defendant, consistent with my ruling.

SO ORDERED.

Dated:     June 24 2011
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

36