UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
THE GAP, INC., and :
GAP (APPAREL) LLC, :
: 07 Civ. 9614 (AKH)
:
        Plaintiffs, and : ECF Filing
        Counterclaim Defendants, :
:
        -against- : **DECLARATION OF ASHLEY**
: **CHRISTOPHER IN SUPPORT OF G.A.P**
G.A.P ADVENTURES INC., : **ADVENTURES INC.'S MOTIONS TO**
: **AMEND OF ALTER THE JUDGMENT**
        Defendant, and : **AND TO SUSPEND OR STAY THE**
        Counterclaim Plaintiff. : **INJUNCTION PENDING APPEAL**
:
---------------------------------------------------------x

I, Ashley Christopher, do hereby declare and state as follows:

1.  I am an employee of G.A.P Adventures, the defendant in this litigation, and a member of its E-Commerce Group. I reside at 1106 - 160 Hughson St S, Hamilton, Ontario, Canada, L8N 3V2. In 2003, I earned a Bachelor's of Science degree from the University of Calgary in Computer Science. After graduation, I became a Software Developer at R4NT Magazine, providing a variety of website consulting including database design and backend development. I became a Systems Analyst for Pason Systems, and among other responsibilities, I designed and implemented their oil-field transmission software. I next went to Manulife Bank Systems and maintained their automated loan underwriting application.

2.  In March 2008, I joined G.A.P Adventures. I am currently a Senior Software Developer within the E-Commerce Group and am responsible for maintaining the www.gapadventures.com website of G.A.P Adventures.

3.  G.A.P Adventures' E-Commerce Group also is responsible for maintaining the G.A.P Adventures content that is displayed on other third party websites with whom G.A.P Adventures partners. There are currently ten third party websites with whom G.A.P Adventures partners; such third parties are referred to as "white labels" and include, for example, gap.expedia.ca and gap.aircanadavacations.com, and others. The "white labels" do not include social media websites like Facebook or Twitter. On a white label website, G.A.P Adventures sells its own tours which are specifically branded and identified with the company's name and trademark.

4.  I have been informed that G.A.P Adventures will be changing the name and trademark of G.A.P Adventures in the United States. I also understand that Plaintiffs contend that during the Transition Period ordered by the Court the current logo cannot be used

and only the format "G.A.P Adventures" can appear on the website. It is the E-Commerce Group that is responsible for making changes on both the G.A.P Adventures website and the white label sites either to change the current uses to a new name or so that U.S. consumers see only the new name and trademark of G.A.P Adventures, to ensure that references to "gap" and "G.A.P Adventures" are removed, and/or ensure that during the Transition Period, if Plaintiffs' understanding is correct, the U.S. consumers see only the "G.A.P Adventures" format of the name. I also understand that G.A.P Adventures will continue to use its current www.gapadventures.com website for the rest of the world.

5. As set out below, both a permanent change to a new name or a temporary change to a use of only the "G.A.P Adventures" format is performed in essentially the same time consuming process. Each involves several involved types of technical computer programming changes, changes to the written copy/trademarks provided on all of the websites, and changes to the physical servers in Canada that host the website content.

6. The first step in completing this process is to create a method to identify U.S. consumers who are accessing the website.

7. In this step, my team will need to create a method to detect when a computer located in the United States is accessing the G.A.P Adventures website. The distinction between U.S. and non-U.S. computers will be made based on the "IP address" of the computer – a code unique to each computer which allows for geographical identification.

8. This step is important because it will allow consumers from the U.S. to be distinguished from others so that such consumers are then redirected to websites containing essentially the same content as the original sites but that includes the new name and trademark.

9.      An IP address can be used to identify the location of the internet service provider through which the internet is being accessed, a very good approximation of the country in which the computer sits. We will then create a program so that our software can interpret such IP addresses, and identify which content that user should access. After creating this program, my team will have to perform quality assurance testing to confirm that the method works for its intended purpose. This first step, of programming the system to identify the location of a computer attempting to access the website based on the computer's IP address and performing the necessary confirmatory testing, is expected to take 3-4 days to complete.

10.     The second step in the overall process is to re-work the "localization" software programs that are currently set-up within our systems. In this step, we will create the infrastructure so that the U.S. consumers accessing the website will be directed to special pages with content that does not use G.A.P Adventures or gap adventures or the word "gap".

11.     Currently, users are able to explore the website content available to users in other countries so that they can see all adventure tours available, even if those adventure tours were being targeted only to consumers in other areas of the world. For example, in the current format, a user in the United States could access the website of G.A.P Adventures in Australia so that the U.S. consumer could see and consider joining a tour that was highlighted on the Australian website. I understand that this practice must now be prohibited to the extent that the Australian G.A.P Adventures website uses the G.A.P Adventures name and trademark (or during the Transition Period, if Plaintiffs' interpretation of the order is correct, the current G.A.P Adventures logo).

12.     Therefore, this localization step also will require G.A.P Adventures to edit all of the content that appears on the international-specific websites so that revised copy, with the

new name and trademark, will be the only copy which is available to U.S. consumers even if they are accessing the foreign websites where the G.A.P Adventures name is in use. At the same time, international consumers must still be able to see the current copy and content of such country specific websites that use the G.A.P Adventures name and trademark. So, for instance, if an Australian consumer views the G.A.P Adventures website, he will see the non-U.S. branding. However, if a U.S. consumer clicks through to the same G.A.P Adventures Australian website, he will see the same content, but all instances of G.A.P Adventures or the logo will be revised to the U.S. appropriate content.

13. The third step is to "dynamically load" all of the copy – for both U.S. and international consumers. This means that all of the copy – distinct copy for U.S. and foreign countries – will be loaded into a database. We will need to create a complex framework so that the database will call up different copy that appears on the user's computer screen depending on that user's location in the U.S. or outside it. Specifically, for U.S. consumers, the database will retrieve and present copy that has no instances of the G.A.P Adventures name or the trademark (or during the Transition Period only the G.A.P Adventures format appears).

14. Since more versions of the website copy will now be required, G.A.P Adventures may need to acquire additional servers for "cacheing". This means that the new servers would store the website content in memory so that that content does not need to be constantly pulled up from the database. This step may be necessary if the changes implemented in this overall process end up slowing the website for consumers. It is expected that requests for additional servers can be made and fulfilled in a timely manner so that this step does not delay the overall process, but it still will take some time to acquire, install, and program the servers.

15.     The website www.gapadventures.com has more than 1,200 pages[1] that are accessed from the main homepage by drop-down menus, hyperlinks or that can be followed from search results. The copy must be written and reviewed for all of them.

16.     These localization processes for the www.gapadventures.com website that comprise this second and third step (including, in sum, creating a localization framework, creating the database and programming its proper use, and rewriting all of the copy for U.S. consumers) will take approximately 4-6 weeks.

17.     In addition, as a fourth step, we must perform localization for the white label websites. There are about 900 pages for each of the ten white labels, although there is some overlap in their content. For these sites, the content must be edited and dynamically loaded onto the servers. This is largely the same process as set forth above for the www.gapadventures.com website, however, this involves the additional step of, in some instances, coordinating the changes with those white labels.

18.     The localization for the white labels will take an additional approximately 2-3 weeks of our staff's time.

19.     Fifth, the team will need to localize the search engine that is available to users on the www.gapadventures.com website.

20.     The website provides a text box where users can enter a subject to search on, for example "Amazon trips" or "South Africa itinerary". A list of results are retrieved and appear. Users can review their results and click on – or link to – a search result that interests them.

---

[1] This estimate of 1,200 is definitely low. It is based on the work of a website "crawler" to crawl through the website and count the pages. However, several pages were originally set up to avoid being counted by a "crawler". It is not currently known how many of these additional pages there are.

21. However, because U.S. consumers can only link to the U.S. content that does not include the G.A.P Adventures name or mark, we will need to create a search index so that the U.S. users who enter a search phrase or word in the search engine are searching and retrieving U.S. content only.

22. This fifth step, of localizing the search engine, will take approximately 1.5 additional weeks of staff programming time.

23. Sixth, we next need to make changes to our "load balancers".

24. Load balancers are web servers that we build in-house. Their function is to take over internet traffic if the website goes down. When our internet page is off-line (for maintenance, technical problems, etc.) and a consumer tries to visit any of our webpages – either the homepage www.gapadventures.com or any link for our trips or other information – the load balancers will call up a page that informs consumers that we are currently having technical problems. The page invites consumers to call the company toll-free or to email us. Most importantly for these purposes, the page displaying the technical difficulties message includes the G.A.P Adventures name and trademark.

25. To make sure that the technical difficulties message that is displayed for U.S. consumers includes only the U.S. copy, we will need to do some additional programming to have the load balancers use computer IP addresses (as described above) to recognize the country from which consumers are connecting.

26. As with previous steps, we will need to create two different versions of this page. We will create copy for U.S. consumers which uses the new name and trademark and a different toll-free phone line and/or email contact address. Consumers from other countries will see the current copy with the G.A.P Adventures name and trademark.

27. We will then have to program the load balancers to display the proper page once the country of connection has been identified based on IP address.

28. We expect this sixth step to take an additional 1-2 days of staff time.

29. With respect to all the various steps described above, I estimate the process will take at least 2-2.5 months to implement all of the changes described here.[2] However, if Plaintiffs' interpretation of the Court's order means only the "G.A.P Adventures" format can be used in the Transition Period, that means most of the above steps would have to be performed twice, once to change the current programming and website pages to show only the "G.A.P Adventures" format and then to the new name. This means that (a) the current injunction order would not permit enough time to change the website to the "G.A.P Adventures" format by July 27th if Plaintiffs are correct, or (b) the www.gapadventures.com website would have to be shut down to U.S. customers. It also means that if we were to even attempt to make that change we would have to take time and resources from the process of changing to a new name and not be likely to do that by the end of the Transition Period.

30. The above time estimates would require all four of the E-Commerce Group employees to be working full time on the process, with the exception of those times when

---

[2] One important matter that is not discussed in this declaration is the requirement that the reservation system be localized. First, this involves changing the content and the access to U.S. consumers of the promotions that are available on the www.gapadventures.com website, as well as the websites of the white labels. Second, the Sherpa system has to be localized. Sherpa is an internal website used only by travel agents to make reservations. However, it is fully branded with the G.A.P Adventures name and trademark. Changing these systems is a distinct project because it is the G.A.P Adventures Reservations Group that controls this content and operates the promotions portions of the www.gapadventures.com website and the Sherpa system. A declaration of Mark Wisniak explains further the timing and description of the necessary changes for this process.

the work of one employee must be completed before additional work can be completed by the group.

31. Hiring additional programmers would not streamline this process or reduce the time involved. This is because those new developers would have to be brought up to speed on the company's work, the website content and its operation, before they could perform any substantial work that would be of assistance in this project. The current E-Commerce Group employees would have to be the ones assigned to educate those new employees, thereby detracting from their focused and full-time work on the project.

32. Finally, one additional factor may impact the processes and changes described here. Although we can begin this work using a "placeholder" name for the company, the content and copy cannot be changed until the new name and trademark are created. This is a detailed and carefully vetted process that is not within my purview. The changes described here to be undertaken by my E-Commerce Group may require additional time if a new name is not chosen by the time the programmers in my E-Commerce Group and the copy writers require it for the processed described above.

33. Additionally, there is a blog and community forum that appear on our website. G.A.P Adventures employees, as well as the public (*e.g.*, past and future travelers), can post information about trips, feedback from participants, etc. Although this is part of the website, preparing the Blog to conform it to these requirements is a wholly separate process. Because none of the developers on our current E-Commerce team are familiar with the programming framework used for the blog, it is likely that this work would be contracted out or otherwise one of our programmers would need to take the time to become familiar with the language. Basically, the programmers would need to build a localization engine and then change

the content on the blog. In my estimation, this project would take about 1 week. If we hire an outside contractor, this work could be done simultaneously. If one of our programmers were to be required to do this, it would add another 2 weeks to the overall process.

34.   I understand that under certain circumstances and upon further court proceedings in the U.S., we may be able to revert back to using G.A.P Adventures in the United States. If this happened, it would have been extremely inefficient to have implemented the technically complex and time-consuming changes explained above. The process of switching back from the revised systems (which would use a different name and trademark for U.S. consumers) to the current systems (which use G.A.P Adventures worldwide) would take approximately 1 month. "Residual effects" may also exist if we need to remove the new programming and revert to the old because multiple changes of this type tend to create unexpected results. More importantly, switching back to the G.A.P Adventures name worldwide means that there would have been approximately 4 to 5 months of staff resources expended unnecessarily in making the changes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 14, 2011

_____
Ashley Christopher